IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

| | | |
|---|---|---|
| IN THE MATTER OF THE TAX<br>LIABILITIES OF:<br><br>JOHN DOES, United States taxpayers who,<br>at any time during the years ended<br>December 31, 2012, through December 31,<br>2017, used the services of the Wessell<br>Group or its predecessors, subsidiaries,<br>divisions, affiliates, or website domains<br>(collectively, the "Wessell Group") to establish,<br>maintain, operate, or control: any foreign<br>financial account or other asset; any<br>foreign corporation, company, trust,<br>foundation, or other legal entity; or any<br>foreign or domestic financial account or<br>other asset in the name of a foreign entity. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Case No. |

FILED BY _____ D.C.

SEP 1 1 2018

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. FT. LAUD.

**UNITED STATES' MEMORANDUM IN SUPPORT OF ITS *EX PARTE* PETITION FOR
LEAVE TO SERVE "JOHN DOE" SUMMONSES**

The United States of America submits this memorandum in support of its petition for an

order approving the issuance of Internal Revenue Service "John Doe" summonses to Kevin W.

Wessell; Lesli A. Wessell (aka Leslie A. Wessell); Sophia R. Wessell; Bank of America, NA;

and Wells Fargo, NA.[1] The three Wessells are part owners of a network of companies known as

the Wessell Group, and the two banks are custodians of the Group's records. Through its

sprawling operations, the Wessell Group has helped thousands of customers engage in complex

offshore transactions that have all of the hallmarks of tax-avoidance schemes. The IRS seeks to

issue the summonses to learn the identities of U.S. taxpayers who have used the Wessell Group's

services between 2012 and 2017 to create offshore entities and/or accounts. In turn, this would

---

[1] The United States is also filing petitions in the Southern District of New York and the Central
District of California seeking to serve recordkeepers in those jurisdictions with John Doe
summonses arising out of the same investigation.

allow for examinations to determine whether any of these taxpayers have violated the internal
revenue laws.

Pursuant to 26 U.S.C. § 7609(h), the Court's decision on whether to approve issuance of
John Doe summonses "shall be made *ex parte* and shall be made solely on the petition and
supporting affidavits." Thus, the pleadings filed in this proceeding will not be served upon any
person or entity, and no other filings are permitted from other persons or entities. Accordingly,
this matter is ripe for the Court's consideration. The United States requests that the Court review
the petition and supporting documents and enter the proposed order at the Court's earliest
opportunity.

## INTRODUCTION

In an effort to evade their federal tax obligations, U.S. taxpayers often place assets and
income in undisclosed foreign bank accounts in countries known for their financial secrecy. In
some cases, taxpayers use shell entities to serve as the nominal owners of these accounts with the
hope of further obscuring their interests. Taxpayers who fail to report foreign accounts or the
income placed in such accounts are nevertheless liable for federal income taxes. In addition,
using these practices to evade one's reporting and tax obligations is illegal, and taxpayers who do
so face the prospect of substantial penalties and criminal prosecution. While taxpayers
employing such tactics are notoriously—and intentionally—difficult to track, they cannot hide
their activities completely. Critically, their transactions are often reflected in the records of the
companies that they engage to set up their offshore entities and accounts.

The United States now seeks this Court's permission, pursuant to 26 U.S.C. §§ 7609(f)
and (h), to issue five John Doe summonses to obtain records related to the Wessell Group, a
network of companies that exist largely to allow customers to hide assets overseas. The IRS

2

knows that U.S. taxpayers have likely used the Wessell Group to set up and maintain undisclosed entities and accounts, which in turn allowed them to evade their U.S. tax obligations. However, although the IRS is aware that John Doe taxpayers exist who are likely employing the Wessell Group's services to violate the tax laws, it does not know their identities. The summonses are meant to uncover that information.

The issuance of the summonses is warranted here because (i) the summonses relate to an ascertainable group or class of persons comprised of U.S taxpayers who have used the Wessell Group to set up offshore entities and/or accounts; (ii) there is a reasonable basis for believing these U.S. taxpayers may fail or may have failed to comply with the internal revenue laws; and (iii) information sufficient to establish these U.S. taxpayers' identities is not readily available to the IRS from other sources. In support of this petition, the United States submits this memorandum, the declaration of IRS Senior Revenue Agent Karen Cincotta ("Cincotta Decl."), the exhibits to the declaration, and a proposed order.

## BACKGROUND

## I.      U.S. Tax Laws Require Disclosing Foreign Financial Accounts and Paying Applicable U.S. Taxes

United States taxpayers with gross income in excess of a minimum threshold amount in any one calendar year are required to file a U.S. Individual Income Tax Return (IRS Form 1040) with the IRS that reports income from all sources worldwide. *See* 26 U.S.C. § 61. U.S. taxpayers must also disclose on their Form 1040 direct or indirect financial interests in, or signature authority over, any foreign financial accounts and the countries in which such accounts are located. Internal Revenue Manual § 4.26.16.3.3(3)(A); *see also* 26 U.S.C. § 6038D; 31 C.F.R. § 103.56(g). Further, U.S. taxpayers with any such foreign accounts that had an aggregate value of $10,000 or more at any time during the previous calendar year are required to file a Report of

3

Foreign Bank and Financial Accounts ("FBAR") with the Department of the Treasury. 31 U.S.C. § 5314; 31 C.F.R. § 1010.350. These FBARs require the U.S. taxpayers completing them to identify the financial institutions that held each foreign account, the type of the account (either bank, securities, or other), the account number, and the maximum value of the account during the calendar year at issue. Foreign bank accounts that are not reported to the IRS are known as undisclosed offshore accounts.

## II.    Use of Offshore Tax Havens

Offshore tax abuses cost the United States approximately $150 billion in tax revenue each year. Cincotta Decl. ¶7. Many of these losses stem from U.S. taxpayers' use of tax haven countries, which "hold trillions of dollars in assets provided by citizens of other countries, including the United States." *Id.* ¶8. To attract foreign assets, these tax havens "have enacted laws enabling nonresidents to form at minimal cost companies, trusts, foundations, and other legal entities to hold their assets in financial accounts protected by secrecy laws and practices enforced with criminal and civil penalties." *Id.* ¶9.

The IRS has used the results of various John Doe summonses to conduct thousands of examinations into overseas assets. *Id.* ¶10. Through these examinations, the IRS has learned that U.S. taxpayers seeking to hide their money in other countries almost always open foreign financial accounts and frequently create offshore entities (such as shell corporations and sham trusts) as well. *Id.* To navigate these complex transactions, U.S. taxpayers often engage service providers that advertise their expertise in moving money overseas. *Id.* ¶11. These providers will set up foreign accounts and entities for U.S. taxpayers and supply nominee directors, officers,

4

and trustees to mask the true source of the funds. *Id.*[2] Indeed, a "sophisticated offshore industry,

composed of a cadre of international professionals including tax attorneys, accountants, bankers,

brokers, corporate service providers, and trust administrators, aggressively promotes offshore

jurisdictions to U.S. citizens as a means to avoid taxes and creditors in their home jurisdictions."

Cincotta Decl. ¶12.

## III.    The Wessell Group's Involvement in Offshore Transactions

### A.    The Wessell Group's structure

The Wessell Group is a network of businesses controlled by Kevin Wessell and partly

owned by him, his wife Lesli, and his children, Sophia and Adam.[3] There are at least 18 entities

that are—or have been—part of the Wessell Group. Cincotta Decl., Exhibits A–E. The structure

of the Wessell Group has changed frequently over the years, and the evolving relationships

between the companies are depicted in flowcharts in Exhibit 1 to the Cincotta Declaration.

Broadly speaking, and as detailed below, the entities in the Wessell Group exist to help clients

hide money overseas. Though the entities work toward a common goal, the precise boundaries

between them are often difficult to discern. As one court concluded in a case involving a subset

of the companies within the Wessell Group, "[g]iven the interconnectedness of [Kevin] Wessell

and the corporate defendants, and the fraudulent purposes for which these entities were designed,

---

[2] Nominees are individuals who are used as the public face of an entity to hide the involvement of the U.S. taxpayer (*i.e.*, the beneficial owner). Nominees usually "have no knowledge of the [entity's] affairs or accounts, cannot control or influence the entity, and will not act unless instructed to by the beneficial owner." Internal Revenue Service, Abusive Offshore Tax Avoidance Schemes—Glossary of Offshore Terms, *available at* https://www.irs.gov/businesses/small-businesses-self-employed/abusive-offshore-tax-avoidance-schemes-glossary-of-offshore-terms.

[3] Adam Wessell is currently outside of the country, and the IRS is therefore not seeking to serve him with a John Doe summons.

the exact relationship between the entities involved is unclear." *Alexander v. Incway Corp.*, No.

CV-11-8851-DSF-VBKX, 2013 WL 5603932, at \*8 (C.D. Cal. Oct. 11, 2013), *rev'd in part on other grounds*, 633 F. App'x 472 (9th Cir. 2016).

### B. The Wessell Group's services

In his writings, Kevin Wessell has explained that the "secret to asset protection" is to "[o]wn nothing" and "[c]ontrol everything." Cincotta Decl. ¶ 21. He has encouraged readers to use "legal tools" that will "allow you to have control of your resources without having them titled in your name." *Id.*

The Wessell Group provides several services to achieve this goal. For instance, the Wessell Group advertises to its customers that Nevis is among the "most favorable . . . offshore tax havens." *Id.* ¶ 29. Among the services the Wessell Group offers is pairing an offshore company in a place like Nevis with an offshore bank located in a different country. *Id.* ¶ 30. The Wessell Group explains that this allows customers to have "an extremely high level of anonymity because online banking offshore transfers will be in your offshore company['s] name rather than your personal name." *Id.*

The Wessell Group also provides extensive nominee services. For example, Wessell Group customers can purchase a "nominee privacy service" as a means for the individual to "maintain 100% control through voting rights while, at the same time, keeping [the client's] name off of the officers/directors/managers list of offshore companies. When asked in court if or in a deposition if you are a director or manager of the company you can truthfully state that you are not." *Id.* ¶ 33. The Wessell Group also supplies nominees through its "Samoa Complete Management Package," which includes a variety of services to assist clients in the maintenance and operation of their offshore structures. Some of these services include a Samoan mailing

6

address with mail forwarding to the client, a Samoan telephone number answered by a live receptionist, nominee directors and officers, and a power of attorney giving the client 100 percent control. *Id.* ¶ 34.

Another example of the services offered by the Wessell Group is to form limited liability companies in Nevis and put the assets in Cook Islands trusts. *Id.* ¶ 37.[4] The Wessell Group instructs clients that this arrangement would allow U.S. persons to defeat orders to repatriate the money by telling courts that they lack control over the foreign accounts. It explains that when a "bad thing" (*e.g.*, a lawsuit) happens, the Cook Islands trustee "steps in" to manage the Nevis LLC and prevents it from complying with court orders to turn over money. Cincotta Decl. ¶ 37.This remains the case, according to the Wessell Group, until the client is out of legal jeopardy, at which point "the string of control—the management of the Nevis LLC—goes back to you and you are back in the driver's seat with all of your money in-tact." *Id.* The Wessel Group even offers arguments clients can make to try to avoid being held in contempt of court. *Id.* ¶ 38.

---

[4] Nevis is an Eastern Caribbean island that is part of a federation with St. Kitts. The federation is known as St. Kitts and Nevis ("SKN"). The U.S. State Department has determined that SKN is "susceptible to corruption and money laundering" and that the "growth of its offshore sector coupled with unusually strong bank secrecy laws also remains problematic." Dep't of State, International Narcotics Control Strategy Report: Volume 2 161 (2017), *available at* https://www.state.gov/documents/organization/268024.pdf. The prevalence of anonymous accounts, the "overall lack of transparency of beneficial ownership of legal entities," and the "ambiguous regulatory framework concerning customer due diligence" combine to make Nevis a "desirable location for criminals to conceal proceeds." *Id.* at 162. Meanwhile, the Cook Islands, which are located in the South Pacific, "generally disregard foreign court orders" and have become a hotspot for, among others, "people who have been convicted of Medicaid fraud, Ponzi schemes and bilking employee pension funds." *See* Leslie Wayne, Cook Islands, a Paradise of Untouchable Assets, N.Y. Times (Dec. 14, 2013), *available at* http://www.nytimes.com/2013/12/15/business/international/paradise-of-untouchable-assets.html?mcubz=3.

## C.    U.S. taxpayers' use of the  Wessell Group's services to violate the internal revenue laws

The IRS believes that numerous U.S. taxpayers have used the Wessell Group's services to avoid disclosure of offshore accounts, assets, and associated taxable income. In the IRS's experience, U.S. taxpayers hold undisclosed foreign accounts in order to conceal their income from the IRS. Cincotta Decl. ¶ 92. Indeed, there is a "direct correlation between unreported income and the lack of visibility of that income to the [IRS]." *Id.* ¶ 93. Based on that experience, the IRS has determined that the Wessell Group's services bear "the hallmarks of offshore tax evasion." *Id.* ¶ 27. Through its investigation, the IRS has also developed a number of concrete examples, described below, to substantiate this determination.

For instance, one Wessell Group customer, Gregory Stodghill, pled guilty in 2013 to tax evasion. *Id.* ¶ 61. Through the Wessell Group, Stodghill set up entities in the British Virgin Islands and Panama, as well as at least one in the United States. *Id.* He proceeded to use these entities as nominees to try to hide his connection to assets. *Id.* For instance, he used a Panamanian entity to mask his interest in a residence he purchased. *Id.* All told, he attempted to conceal more than $1 million in taxable income. *Id.*[5]

Additionally, through its voluntary disclosure programs, which allow U.S. taxpayers to self-report violations of the internal revenue laws, the IRS learned of two individuals (a husband and wife) who used the Wessell Group's services as part of a scheme that led to unreported income. *Id.* ¶ 57. No later than 2003, the couple (hereinafter "Taxpayers 1 and 2") began hiding assets offshore, and they engaged the Wessell Group in 2011 to expand their overseas portfolio.

---

[5] Separately, the IRS has also learned of a customer who used a Wessell Group product to commit mail fraud. *Id.* ¶62.

*Id.* ¶¶ 57–58. Specifically, Taxpayers 1 and 2 each paid at least $3,874 to the Wessell Group to set up an entity in Belize, as well as multiple foreign bank accounts. *Id.* ¶ 58.

Shortly afterward, however, Taxpayers 1 and 2 discontinued use of their overseas holdings and reported their violations to the IRS, which led to the imposition of over $200,000 in penalties. *Id.* ¶ 59. The penalties were only for tax years 2003–2010 and were not tied to the entity or accounts set up by the Wessell Group in 2011 because Taxpayers 1 and 2 abandoned the scheme that year. *Id.* Nonetheless, their use of the Wessell Group was consistent with the scheme that led to the penalties and could have led to violations of the tax laws had they not decided to make a voluntary disclosure. *Id.*

Meanwhile, through information available to it, the IRS also learned of another U.S. taxpayer (hereinafter "Taxpayer 3") who failed to disclose offshore holdings set up by the Wessell Group. *Id.* ¶ 60. Taxpayer 3 used the Wessell Group to establish a Turks and Caicos entity in 2007. *Id.* The Wessell Group supplied the directors for the Turks and Caicos entity, and Taxpayer 3 told the IRS he did not know the entity's physical address. *Id.* Taxpayer 3 did not report the entity on his 2007 tax return. *Id.* He sold the entity in 2008 and also failed to report that transaction. *Id.*

Finally, links to Wessell Group entities have surfaced in connection with other John Doe summonses that the IRS has issued to investigate tax avoidance schemes. For example, the IRS issued a John Doe summons to Wells Fargo for records related to CIBC FirstCaribbean International Bank Limited ("FCIB") based on its belief that U.S. taxpayers were using correspondent bank accounts at FCIB to hide assets. *Id.* ¶ 63; *In re Tax Liabilities of John Does*, No. 3:13-cv-01938 (N.D. Cal.). In response, Wells Fargo produced records of wires between the Wessell Group and financial institutions in the Bahamas. *Id.* ¶ 63. The Wessell Group also

appeared in response to John Doe summonses issued to investigate potential tax abuses by

customers of Belize Bank International Limited, Belize Bank Limited, and Belize Corporate

Services. *Id.* ¶¶ 64, 68; *In re Tax Liabilities of John Does*, No. 1:15-MC-23475 (S.D. Fla.). In

particular, the records from those summonses revealed at least 69 wire transactions involving the

Wessell Group. *Id.* ¶ 68. The appearance of Wessell Group transactions in these other John Doe

cases provides further evidence that its customers are attempting to evade the internal revenue

laws. *Id.* ¶¶ 63, 67.

### D.     The IRS's current investigation

The IRS is seeking to issue summonses that will allow it to identify U.S. taxpayers who

are clients of the Wessell Group and who have not disclosed the existence of their offshore

holdings and/or have not reported income earned from those holdings. The "John Doe" class,

therefore, is as follows:

> United States taxpayers who, at any time during the years ended December 31,
> 2012, through December 31, 2017, used the services of the Wessell Group or its
> predecessors, subsidiaries, divisions, affiliates, or website domains (collectively,
> the "Wessell Group") to establish, maintain, operate, or control: any foreign
> financial account or other asset; any foreign corporation, company, trust,
> foundation, or other legal entity; or any foreign or domestic financial account or
> other asset in the name of a foreign entity.

The summonses the IRS would like to issue in this jurisdiction are attached as Exhibits A–E to

the Cincotta Declaration. As discussed below, the summonses are authorized and appropriate

under §§ 7609(f) and (h) of the Internal Revenue Code (26 U.S.C.).

### ARGUMENT

One of the primary functions of the IRS is to review and audit tax returns submitted by

U.S. taxpayers to ensure that all applicable taxes have been paid. Accordingly, the Internal

Revenue Code requires the Secretary of the Treasury to "cause officers or employees of the

Treasury Department to proceed, from time to time, through each internal revenue district and inquire after and concerning all persons therein who may be liable to pay any internal revenue tax." 26 U.S.C. § 7601. To aid the IRS in carrying out this function, § 7602 authorizes the Secretary to issue summonses for records and testimony that may be relevant or material to an investigation. Specifically, § 7602, from which the IRS derives its principal information-gathering powers, authorizes the IRS:

> [f]or the purpose of ascertaining the correctness of any return, making a return where none has been made, [or] determining the liability of any person for any internal revenue tax . . . [t]o summon . . . any person having possession, custody, or care of books of account containing entries relating to the business of the person liable for tax . . ., or any other person the Secretary may deem proper, to appear . . . and to produce such books, papers, records, or other data, and to give such testimony, under oath, as may be relevant or material to such inquiry.

In passing § 7602, Congress intended "to provide the Secretary [of the Treasury] with broad latitude to adopt enforcement techniques helpful in the performance of his tax collection and assessment responsibilities." *United States v. Euge*, 444 U.S. 707, 715 n.9 (1980). Indeed, the Supreme Court has noted that § 7602 forms the "centerpiece" of the IRS's "expansive information-gathering authority." *United States v. Arthur Young & Co.*, 465 U.S. 805, 816 (1984); *see also United States v. Clarke*, 134 S. Ct. 2361, 2367 (2014) ("And such an investigatory tool, we have recognized, is a crucial backstop in a tax system based on self-reporting."). "Under 26 U.S.C. § 7602, the IRS has wide latitude to issue a summons for investigatory purposes." *Reiserer v. United States*, 479 F.3d 1160, 1166 (9th Cir. 2007) (citing *United States v. Jose*, 131 F.3d 1325, 1327 (9th Cir. 1997) (en banc)). "To establish a need for judicial enforcement, [the] showing need only be minimal . . . . [T]he statute must be read broadly in order to ensure that the enforcement powers of the IRS are not unduly restricted." *Jose*, 131 F.3d at 1327–28 (internal quotation marks omitted); *see also Arthur Young*, 465 U.S. at

11

816 ("[T]he very language of § 7602 reflects . . . a congressional policy choice *in favor of*

*disclosure* of all information relevant to a legitimate IRS inquiry. In light of this explicit

statement by the Legislative Branch, courts should be chary in recognizing exceptions to the

broad summons authority of the IRS.") (emphasis in original).

The IRS's authority to issue John Doe summonses to discover the identities of

individuals who may have failed to disclose all of their income was expressly recognized by the

Supreme Court in *United States. v. Bisceglia*, 420 U.S. 141, 150 (1975), and later codified in 26

U.S.C. § 7609(f), which provides:

> Any summons . . . which does not identify the person with respect to whose
> liability the summons is issued may be served only after a court proceeding in
> which the Secretary establishes that—
>
> (1)  the summons relates to the investigation of a particular person or
> ascertainable group or class of persons,
>
> (2)  there is a reasonable basis for believing that such person or group
> or class of persons may fail or may have failed to comply with any
> provision of any internal revenue law, and
>
> (3)  the information sought to be obtained from the examination of the
> records or testimony (and the identity of the person or persons with
> respect to whose liability the summons is issued) is not readily
> available from other sources.

The Court's determination as to whether the IRS has met the requirements under § 7609(f) for

the issuance of a John Doe summons "shall be made *ex parte* and shall be made solely on the

petition and supporting affidavits." 26 U.S.C. § 7609(h)(2).

Here, the Court should authorize the issuance of the summonses because all three

statutory prerequisites have been met. First, the summonses relate to the investigation of an

ascertainable group or class of persons, namely U.S. taxpayers who used the services of the

Wessell Group between 2012 and 2017 to set up foreign entities or accounts. Second, there is a

12

reasonable basis for believing that U.S. taxpayers who have used the Wessell Group's services may fail or may have failed to comply with the internal revenue laws. And third, the information sought (including the identities of the members of the John Doe class) is not readily available to the IRS from other sources.

## I.    The Investigation Concerns an Ascertainable Class

The summonses here clearly relate to an investigation of an ascertainable group of people, which the summonses define as individuals who used the services of the Wessell Group between 2012 and 2017 to set up foreign entities or accounts. Cincottta Decl., Exhibits A–E. This is sufficient to meet the first statutory requirement.

Numerous cases have endorsed the service of John Doe summonses seeking information on similar classes. *E.g.*, *In re Tax Liabilities of John Does (UBS AG)*, No. 1:08-mc-21864 (S.D. Fla. Jul. 1, 2008).[6] In the *UBS AG* case, the court approved the issuance of an IRS John Doe summons for records in furtherance of an investigation into the identity of unknown taxpayers having signature or other authority over accounts at the Swiss bank. ECF No. 5 at 1–2. In the process, the court (and each of the courts listed in note 7) found that a class of John Does, substantially similar to the class here, was ascertainable. *Id.* at 1; *see also In re Tax Liabilities of John Does*, No. 2:10-mc-00130, 2011 WL 6302284, at *2 (E.D. Cal. Dec. 15, 2011) (holding that an IRS investigation related to an ascertainable group of people where the summons "squarely particularize[d] the individuals sought from the general public" by identifying the class

_____

[6] *See also In re Tax Liabilities of John Does (Sovereign Management & Legal, Ltd.)*, No. 1:14-mc-417 (S.D.N.Y. Dec. 19, 2014); *In re Tax Liabilities of John Does (Butterfield Bank)*, No. 1:13-mc-377 (S.D.N.Y. Nov. 12, 2013); *In re Tax Liabilities of John Does (Zurcher Kantonalbank)*, No. 1:13-mc-378 (S.D.N.Y. Nov. 7, 2013); *In re Tax Liabilities of John Does (First Caribbean Int'l Bank)*, No. 3:13-cv-1938 (N.D. Cal. Apr. 29, 2013); *In re Tax Liabilities of John Does (Wegelin & Co.)*, No. 1:13-mc-21 (S.D.N.Y. Jan. 29, 2013); *In re Tax Liabilities John Does (HSBC India)*, No. 4:11-cv-1686 (N.D. Cal. Apr. 7, 2011).

13

as California residents who between 2005 and 2010 were involved in certain real property transfers for little or no consideration); *In re Tax Liabilities of John Does*, No. 03-22793-CIV, 2003 WL 22953182, at *1 (S.D. Fla. Oct. 30, 2003) (holding that an IRS investigation related to an ascertainable group of people where the summons identified the class as U.S. taxpayers who between 1997 and 2003 sold credit insurance policies where the policies were reinsured with entities in the Turks and Caicos). Here, similarly, the IRS has established that the investigation underlying the summonses relates to an "ascertainable group or class of persons." *See* 26 U.S.C. § 7609(f).

## II.     There is a Reasonable Basis to Believe that the Unknown Persons May Fail or May Have Failed to Comply with the Internal Revenue Laws

The IRS has a reasonable basis to believe that the unknown individuals who comprise the group of persons set forth in the summonses may fail or may have failed to comply with provisions of the internal revenue laws. When enacting § 7609(f), Congress did "not intend to impose an undue burden on the [IRS] in connection with obtaining a court authorization to serve this type of summons." H. Rep. No. 940658, 94th Cong., 1st Sess., at 311. Accordingly, to meet the "reasonable basis" prong, the IRS need only show that a transaction has occurred that is "of such a nature as to be reasonably suggestive of the possibility that the correct tax liability with respect to that transaction may not have been reported." *Id.* Courts, therefore, have interpreted this requirement narrowly as intended only "to prevent the Service from exercising its summons power in an arbitrary or quixotic manner." *In re Tax Liabilities of John Does (Columbus Trade Exchange)*, 671 F.2d 977, 980 (6th Cir. 1982).

Here, based on the IRS's experience, U.S. taxpayers have made use of offshore vehicles such as those provided by the Wessell Group in order to conceal money from the IRS. *See* Cincotta Decl. ¶¶ 89–94. Meanwhile, the IRS is aware of three Wessell Group customers whose

circumstances suggest that customers are using the Wessell Group to evade the internal revenue laws. *Id.* ¶¶ 57, 59, 60. There have also been proceedings in which defendants admitted to using or were found to have used the Wessell Group's services to commit fraud. *Id.* ¶¶ 61–62. Additionally, results of other John Doe summonses have shown that the Wessell Group has done business with entities who have U.S. customers believed by the IRS to have engaged in tax avoidance. *Id.* ¶¶ 63–68. And finally, the IRS's investigation has uncovered a number of instances in which the Wessell Group marketed its services as a means to conceal assets. *See supra* section III.B.

Accordingly, this information is sufficient to establish that the IRS has a reasonable basis for investigating the group of unknown persons included in the summonses. *See, e.g., United States v. Pittsburgh Trade Exchange, Inc.*, 644 F.2d 302, 306 (3d Cir. 1981) (IRS agent's testimony that transactions of the type the summoned party arranged for its clients were "inherently susceptible . . . to tax error" sufficient to meet "reasonable basis" prong); *United States v. Ritchie*, 15 F. 3d 592, 601 (6th Cir. 1994) (clients' payment for legal services with large amounts of cash provided reasonable basis to issue John Doe summons). Here, as the Cincotta Declaration demonstrates, the IRS has abundant evidence that the John Doe class includes U.S. taxpayers who are not complying with the law.

## III. The Information Sought About the John Doe Class Is Not Readily Available from Other Sources

Finally, the information the IRS is seeking through the summonses is not readily available to it from any other sources. The identities of individuals is information that is not readily available to the IRS when those identities are known to third parties who "are not required to identify" them to the IRS in the absence of a summons. *United States v. Liebman*, 742 F.2d 807, 808 (3d Cir. 1984). In *Liebman*, the Third Circuit determined that the IRS could

not readily access the names of the John Does, all clients of a law firm who deducted from their taxes legal fees paid in connection with the acquisition of certain tax shelters, from any source other than the law firm itself, including the IRS's own tax records, because "taxpayers who deduct legal fees are not required to identify the recipients." *Id.* Here, the very need for the John Doe summonses is premised on the fact that U.S. taxpayers who have been clients of the Wessell Group failed to disclose the identity of their offshore assets to the IRS. Their identities are therefore unknown to the IRS.

The fact that the IRS was alerted to the existence of a class of persons reasonably likely to be violating the internal revenue laws from other sources does not undermine the United States' ability to meet this third statutory requirement. *See In re Tax Liabilities of John Does*, 2003 WL 22953182, at *1. In that case, an informant had alerted the IRS "to the existence of a class of persons engaged in transactions as subsidiaries of [American Bankers Insurance Group, Inc. ("ABIG")] that are violative of [the] internal revenue laws." *Id.* The court noted that although the IRS knew about the existence of the class, the identity of the members of the class was "not readily available through a means other than from [ABIG] itself." *Id.* Here, similarly, although the IRS is aware that a group of U.S. taxpayers who are clients of the Wessell Group are likely in violation of the internal revenue laws, it cannot readily establish the identity of the members of that group from any source other than the parties to which it seeks to issue summonses in this jurisdiction and others.

## CONCLUSION

The United States has shown that the IRS has met the requirements of 26 U.S.C. § 7609(f) in order to be allowed to serve its John Doe summonses. Accordingly, the United States' petition should be granted.

Dated: September 10, 2018                          Respectfully submitted,

                                                   RICHARD E. ZUCKERMAN
                                                   Principal Deputy Assistant Attorney General

                                                   STEVEN C. WOODLIFF
                                                   Florida Bar No. 85593
                                                   ROBERT S. SILVERBLATT
                                                   Virginia Bar No. 85506
                                                   Trial Attorney, Tax Division
                                                   U.S. Department of Justice
                                                   P.O. Box 14198
                                                   Washington, D.C. 20044
                                                   202-514-5915 (v)
                                                   202-514-4963 (f)
                                                   Steven.C.Woodliff@usdoj.gov

                                                   Of Counsel:
                                                   BENJAMIN GREENBERG
                                                   United States Attorney

THE UNITED STATES DISTRICT COURT FOR THE
SOUTHERN DISTRICT OF FLORIDA

IN THE MATTER OF THE TAX                         )
LIABILITIES OF:                                  )
                                                 )
JOHN DOES, United States taxpayers who,          )    Case No.
at any time during the years ended               )
December 31, 2012, through December 31,          )
2017, used the services of the Wessell           )
Group or its predecessors, subsidiaries,         )
divisions, affiliates, or website domains        )
(collectively, the "Wessell Group") to           )
establish, maintain, operate, or control:        )
any foreign financial account or other asset;    )
any foreign corporation, company, trust,         )
foundation, or other legal entity; or any        )
foreign or domestic financial account or         )
other asset in the name of a foreign entity.     )

## DECLARATION OF KAREN CINCOTTA

I, Karen Cincotta, pursuant to 28 U.S.C. § 1746, declare and state:

### I.     **Introduction**

1.      I am a duly commissioned Internal Revenue Agent ("Revenue Agent") assigned

as a Senior Revenue Agent in the Offshore Compliance Initiatives Program of the Internal

Revenue Service ("IRS" or "Service"). The Offshore Compliance Initiatives Program develops

projects, methodologies, and techniques for identifying United States persons who are involved

in abusive offshore transactions and financial arrangements for tax avoidance purposes. I have

been a Revenue Agent since 2005 and have specialized in offshore investigations since 2009. I

have been with the Offshore Compliance Initiatives Program since September 2013.

- 1 -

2.     As a Revenue Agent, I have received training in tax law and audit techniques and have received specialized training in abusive offshore tax issues. I also have experience investigating offshore tax matters.

## II.    Internal Revenue Laws Require United States Persons to Report Income Earned Worldwide, to Disclose All Foreign Financial Accounts, and to File Reports of Certain Foreign Financial Accounts.

3.     United States persons with gross income exceeding certain thresholds must file annual income tax returns reporting to the Service their income from all sources worldwide. U.S. taxpayers who fail to report all income on their income tax returns, including income earned in accounts held overseas, have failed to comply with the internal revenue laws.

4.     United States taxpayers who have a financial interest in, or signature authority over, any foreign financial account must disclose the existence of that account on their federal income tax returns. For individuals, this is done by checking the "Yes" box in response to a question at the bottom of Schedule B, *Interest and Ordinary Dividends*, which is attached to the U.S. Individual Income Tax Return, Form 1040 (or Form 1040A).

5.     United States taxpayers who have a financial interest in, or signature authority over, any financial account in a foreign country that has an aggregate value of more than $10,000 at any time during a calendar year are required to file with the Department of the Treasury, for that calendar year, a Report of Foreign Bank and Financial Accounts on FinCEN Form 114 ("FBAR").[1] The FBAR for a calendar year is due by April 15 of the next year.[2] It is the experience of the Service that persons who have failed to file FBARs with respect to foreign

---

[1] For taxable years prior to calendar year 2013, FBARs were reported on Form TD F 90-22.1.

[2] For taxable years prior to calendar year 2016, FBARs were due June 30 of the next year.

- 2 -

financial accounts typically also have failed to disclose those accounts on Schedule B of their income tax returns.

## III. Use of Offshore Structures

6. The Service has long been concerned with the problem of United States persons evading their United States tax obligations by concealing unreported taxable income in accounts in offshore low or no tax jurisdictions, or in financial secrecy jurisdictions. A number of reports describe this problem in detail. *See, e.g.*, *Crime and Secrecy: The Use of Offshore Banks and Companies: Hearing Before the S. Permanent Subcomm. on Investigations of the S. Comm. on Homeland Security and Governmental Affairs*, 98th Cong. (1983), *available at* https://www.ncjrs.gov/pdffiles1/Photocopy/91139NCJRS.pdf; United Nations Office for Drug Control and Crime Prevention, *Financial Havens, Banking Secrecy and Money Laundering* (1998), *available at* http://www.imolin.org/imolin/finhaeng.html; *Tax Haven Banks and U.S. Tax Compliance: Hearing Before the S. Permanent Subcomm. on Investigations of the S. Comm. on Homeland Security and Governmental Affairs*, 110th Cong. (2008), *available at* http://purl.access.gpo.gov/GPO/LPS109146.

7. Indeed, offshore tax abuses cost the United States approximately $150 billion in tax revenue each year. Staff of S. Permanent Subcomm. on Investigations of the S. Comm. on Homeland Security and Governmental Affairs, 113th Cong., *Offshore Tax Evasion: The Effort to Collect Unpaid Taxes on Billions in Hidden Offshore Accounts* 19 (2014), *available at* https://www.hsgac.senate.gov/download/report-offshore-tax-evasion-the-effort-to-collect-unpaid-taxes-on-billions-in-hidden-offshore-accounts-5-14-14-update.

8. Many of these losses stem from U.S. taxpayers' use of tax haven countries, which "hold trillions of dollars in assets provided by citizens of other countries, including the United

- 3 -

States." Staff of S. Permanent Subcomm. on Investigations of the S. Comm. on Homeland Security and Governmental Affairs, 110th Cong., *Tax Haven Banks and U.S. Tax Compliance* 1 (2008), *available at* https://www.hsgac.senate.gov/download/report-psi-staff-report-tax-haven-banks-and-us-tax-compliance-july-17-2008.

9.     To attract foreign assets, these tax havens "have enacted laws enabling nonresidents to form at minimal cost companies, trusts, foundations, and other legal entities to hold their assets in financial accounts protected by secrecy laws and practices enforced with criminal and civil penalties." *Id.* at 32.

10.     Since 2000, the Service has conducted thousands of examinations in cases developed through John Doe summonses issued as part of its Offshore Compliance Initiatives Program. Experience in those examinations has shown that:

a.     Offshore tax evasion by U.S. persons almost always involves a foreign financial account.

b.     Offshore tax evasion by U.S. persons often involves an offshore entity (*e.g.*, a corporation, trust, or foundation) or structure of entities. Nominee directors and/or trustees are typically used for these entities to conceal the true U.S. owner's beneficial ownership of offshore, and sometimes domestic, accounts and assets.

11.     It is also the experience of the Service that U.S. taxpayers forming or acquiring offshore entities or structures, or opening offshore bank accounts, often use the services of offshore trust and corporate service providers who advertise that they do the following:

i.   open bank accounts;

ii.  create corporations, trusts, and foundations; and

- 4 -

iii. serve as nominee directors, officers, and trustees for beneficial
owners.

12.     Indeed, a "sophisticated offshore industry, composed of a cadre of international professionals including tax attorneys, accountants, bankers, brokers, corporate service providers, and trust administrators, aggressively promotes offshore jurisdictions to U.S. citizens as a means to avoid taxes and creditors in their home jurisdictions." Staff of S. Permanent Subcomm. on Investigations of the S. Comm. on Homeland Security and Governmental Affairs, 109th Cong., *Tax Haven Abuses: The Enablers, the Tools and Secrecy* 1 (2006), *available at* https://www.hsgac.senate.gov/subcommittees/investigations/hearings/tax-haven-abuses-the-enablers-the-tools-and-secrecy.

13.     In addition to its examination experience, the Service has received in excess of 55,000 voluntary disclosures from persons with offshore accounts and entities in a series of Offshore Voluntary Disclosure Programs announced as opportunities for persons to self-disclose tax noncompliance involving offshore accounts and arrangements in exchange for limits on their exposure to criminal and civil penalties. Taxpayers making offshore voluntary disclosures reported the use of undisclosed bank accounts in over 600 banks or branches of banks in jurisdictions around the world. Many of these offshore accounts were held through shell companies and trusts, or other practices were employed to conceal beneficial ownership information. Many used the services of offshore trust and corporate service providers.

## IV.   The Wessell Group

14.     The "Wessell Group" is comprised of entities and websites that are operated by, that appear to be controlled by, and that are (or in the past have been) at least partially owned by Kevin W. Wessell ("Wessell"). The Service believes that the Wessell Group is providing

- 5 -

offshore services to U.S. persons to hide their beneficial ownership of assets. Attached hereto as
Exhibit 1 is a chronological series of organizational charts of the Wessell Group and website
domains, showing the year-to-year progression of changes to the structure, based upon
information available to the Service.

15.     The Wessell Group includes the following entities: Eagle Estate, LLC; Lincoln
International Services, Inc; Lincoln Management Group, LLLP; Eagle Rock Mountain, LP; LAP
Trust; Incway Corporation Which Will Do Business In California As Companies Incorporated;
Companies Inc.; Worldwide Education Services; 1-800-Company; 1-800-Company, LLLP;
Presidential Services Incorporated; PSI Holdings, Inc.; National Management Associates, Inc.,
doing business in California as General Corporate Services, Inc.; Offshore Corporation;
OffshoreCorporation.com, which is a website; Offshore Company, Inc., which is a website;
CanadianCorp.com, which is a website; and Corporacion.com, which is a website.

16.     As demonstrated by Exhibit 1, there have been frequent changes in the names of
the companies in the Wessell Group, as well as in the Wessell Group's overall structure.
However, the Wessell Group's purpose—providing services directed at concealing its clients'
beneficial ownership of offshore assets—has remained constant. And through information
available to the Service, I know that when an entity in the Wessell Group purportedly ceases
operations, clients generally migrate to another Wessell Group entity, where they can receive the
same or similar services. A change in name does not mean a change in service.

17.     Though Wessell has always controlled the Wessell Group, he has used his family
members—his wife Lesli A. Wessell, a.k.a. Leslie A. Wessell ("Lesli"), and his children, Sophia
and Adam—as nominees. Take, for instance, LAP Irrevocable Trust, which is a Cook Islands
irrevocable trust. Wessell was the beneficiary of the trust until February 3, 2013, when he was

- 6 -

removed due to judgments against him and associated allegations of fraud. **Exhibit 2 ¶ 57–58;**
**Exhibit 3 at 216:18-217:12.** Lesli then became the primary beneficiary of the trust, with Sophia
and Adam as secondary beneficiaries. **Exhibit 2 ¶ 57.** As another example, based on
information available to the Service, I learned that Sophia and Adam obtained a 98 percent stake
in Eagle Estate LLC in 2006, when they were fourteen and twelve years old, respectively.

18.     The nominee structure used by Wessell for his own businesses is consistent with
the services the Wessell Group has provided to customers seeking to mask their interests in
offshore assets.

## V.     The Wessell Group's Activities

19.     As discussed above, the Service's experience has been that hallmarks of offshore
tax evasion include foreign financial accounts, offshore entities, nominees, and the use of
offshore trust and corporate service providers. The Wessell Group's activities meet all these
criteria.

### A.   Wessell's Writings

20.     The Wessell Group's guiding philosophy is set out in various writings.

21.     For instance, in an article posted online in 2005, Wessell stated:

The secret to asset protection consist [sic] of these two points:

1. Own nothing.
2. Control everything.

What I mean by own nothing is to not own anything in your own name. Instead,
own assets inside legal tools that can protect your assets and your privacy. These
legal tools allow you to have control of your resources without having them titled
in your name.

**Exhibit 4.**

- 7 -

22.     Wessell has also written a book, which is reproduced as **Exhibit 5**. In chapter 7, he touts establishing trusts in the Isle of Man, the Cook Islands, and Nevis. Wessell recommends that assets be transferred to a U.S. limited partnership in which a foreign trust holds a 99 percent limited partnership interest. The U.S. resident, in turn, gets a 1 percent general partnership interest in the U.S. limited partnership. According to Wessell's book, "the general partner has legal control over the entire limited partnership[,] and assets inside" the partnership are protected from seizure by judgment creditors. *Id.* at 44.[3] "Therefore, the U.S. resident controls 100% of the assets, yet 'owns' only 1% of them." *Id.* (emphasis omitted). Wessell also explains that in the three jurisdictions listed above, "you can legally require the [foreign] trustee to take your direction regarding trust investments. Therefore, you essentially remain in control of the trust and keep its asset protection provisions." *Id.* at 42. These structures and arrangements are all directed at concealing the clients' actual beneficial ownership and control of their assets.

23.     In chapter 8, Wessell touts the use of nominees, stating:

> You can even have nominees stand in the place of the stockholders. The nominees can even serve as the officers or directors and the actual owner can maintain control by way of proxy votes. This is a very effective manner of operating if you want your association with an offshore bank kept private.

*Id.* at 45.

24.     Chapter 9 of Wessell's book describes how using a combination of corporations, limited liability companies, trusts, foreign trusts, and foreign corporations can allegedly provide a client with superior financial protection. *Id.* at 47. To urge clients to take action, the book alleges that IRS seizures are at an all-time high. *Id.* at 52.

---

[3] Citations refer to the page numbers in the bottom right of the exhibit.

*B. The Wessell Group's Services*

25.     The Wessell Group's services allow customers to put Wessell's philosophy into practice.

26.     In advertising its services, the Wessell Group makes clear that the purpose is to conceal beneficial ownership.

27.     These services fall into several different categories, and all of them bear the hallmarks of offshore tax evasion.

       *i. Use of tax haven countries*

28.     One of the Wessell Group's core services is to facilitate the concealment of customers' money in tax haven countries.

29.     The Wessell Group advertises to its customers that the "most favorable . . . offshore tax havens are Nevis, Belize, St. Vincent, Panama, and [The] Bahamas." **Exhibit 6**.

30.     For instance, one service offered by the Wessell Group is pairing an offshore company in a place like Nevis with an offshore bank located in a different country. The Wessell Group explains that this allows customers to have "an extremely high level of anonymity because online banking offshore transfers will be in your offshore company['s] name rather than your personal name." **Exhibit 7**.

31.     The Wessell Group also promotes its use of Panamanian companies. For instance, it advertises that "Panama offers some of the most strict banking and financial secrecy laws available in the world." **Exhibit 8**. It also states that "Panama remains the most secure offshore financial center" and claims that Panama does not have any Mutual Legal Assistance

Treaties (MLATs) with any other country. *Id.*[4] In light of this, the Wessell Group offers to set up a "Panama Private Interest Foundation" as an option to control foreign corporations while skirting the controlled foreign corporation rules in the United States. The Wessell Group states that "[t]he objective is to remove ownership from [the client's] personal name, to the name of a foreign entity whose ownership is anonymous." *Id.*

       *ii. Nominee services*

32.     Another common Wessell Group service is the provision of nominee officers or directors who will mask a U.S. person's involvement in an offshore entity.

33.     For example, Wessell Group customers can purchase a "nominee privacy service" as a means for the individual to "maintain 100% control through voting rights while, at the same time, keeping [the client's] name off of the officers/directors/managers list of offshore companies. When asked in court if or in a deposition if you are a director or manager of the company you can truthfully state that you are not." **Exhibit 9**.

34.     The Wessell Group also supplies nominees through its "Samoa Complete Management Package," which includes a variety of services to assist clients in the maintenance and operation of their offshore structures. Some of these services include a Samoan mailing address with mail forwarding to the client, a Samoan telephone number answered by a live receptionist, nominee directors and officers, and a power of attorney giving the client 100 percent control. **Exhibit 10**.

---

[4] This is not accurate. The United States has had an MLAT with Panama since 1995. *See* http://www.passportsusa.com/law/info/judicial/judicial_690.html.

Case 0:18-cv-62135-WPD Document 4 Entered on FLSD Docket 09/11/2018 Page 28 of 46

35. Sometimes the Wessell Group will combine nominee officers and directors with

bearer shares.[5] The Wessell Group advertises this arrangement as follows for the British Virgin

Islands:

> Maximum, [sic] confidentiality and anonymity are provided by
> BVI bearer shares being available by the absence of any
> requirements to file any organizational or accountancy information
> with the Registrar of Companies, [sic] (other than the
> memorandum of Articles of Association), and by share registers
> being available for inspection only by company registered
> shareholders or by order of the BVI court.

**Exhibit 11.**

### iii. Foreign trusts

36. Another device offered by the Wessell Group to clients is the formation of trusts.

37. The Wessell Group touts its ability to form Cook Islands trusts. Specifically, the

Wessell Group states:

> A Cook Islands Trust is the strongest form of asset protection
> worldwide. The Cook Islands are located South of Hawaii. It has
> the strongest asset protection case law history in the world. It is
> not just a theory but each time it has been tested it has protected
> the client's assets . . . even in two cases where the strongest legal
> body in the world—the US government—was the
> plaintiff. (Note: We will not intentionally set up asset protection
> from the US government, so we're simply stating a fact.) . . .
>
> Before the "bad thing" happens, the client (who is the beneficiary
> of the trust) is in the driver's seat. So [the] client can control day-
> to-day activities, we establish a limited liability company that is
> 100% owned by the trust. The client is the Manager of the Nevis
> LLC who controls the LLC['s] assets and is the signatory on all
> accounts.

---

[5] Bearer shares are unregistered shares owned by whoever has physical possession of them. A
bearer share corporation is owned by the person or entity that holds, or "bears," the unregistered
shares.

- 11 -

> When the "bad thing" happens, the trustee steps in as manager of
> the LLC. Now, the trustee is licensed and bonded. By licensed we
> mean they went thorough [sic] intensive background checks to get
> a license. By bonded we mean that the funds are insured. Plus we
> use a 30-year[-]old trust company.

> For client safety and peace of mind, the only time the trustee steps
> in is when the courts would take the money. So, the question is
> this: ["]What would you rather have, a 100% chance of the money
> being taken by the courts? Or would you rather have a licensed,
> bonded trustee, who has never taken a client's money, do what you
> have paid them to do—protect your money?"

> When the "bad thing" goes away the string of control—the
> management of the Nevis LLC—goes back to you and you are
> back in the driver's seat with all of your money in-tact.

> In the mean time [sic], during legal duress, if you have bills, the
> trustee can pay them for you. You can have the trustee pay a
> trusted friend or relative who provides money for you, etc. So, you
> still have access to your money, but the courts do not.

Exhibit 12.

38.     The Wessell Group even promotes trusts as a means of avoiding contempt of

court citations:

> Occasionally clients ask if they can be held in contempt of court
> [if] they do no [sic] bring back the funds that have been placed
> offshore. If the trust is drafted properly the law protects those who
> have placed funds therein. The protection from creditors arises
> from the Duress Clause. If the Trustee determines that your
> request for funds arises from court-ordered duress, the Trustee is
> duty-bound, under the terms of the trust, to step in and protect your
> assets. Let's say a judge orders you to bring back the funds. You
> write a letter to the Trustee letting [him] know that the court has
> ordered you to repatriate the funds and make them available to
> your judgment creditor. The Trustee responds that he senses that
> your letter was written under duress and that [he] will not release
> the money.

> So, you go back to the judge on your appointed day and let him
> know what transpired. The judge puffs up and states his intent to
> detain you. You reply, "Hold on a minute your Honor. In order to

- 12 -

hold me in contempt there are three prima facie essentials. First, there must be a lawful order. Certainly there was one. Second, it must be known to the contemptor. Certainly it was, as I was standing right here when you made it. Finally, it must have been willfully violated. I did not violate your order. I demanded that the trustees return the funds. But [he] did not. So, I did not willfully violate your order, it is simply impossible for me to comply." The same steps are used If [sic] the judge attempts to make you revoke the trust. Thus, domestic law protects you and Cook Islands law protects your money.

**Exhibit 13.**

### iv. *Merchant accounts*

39.     The Wessell Group also advertises offshore banking solutions to merchants involved in "controversial" or "high risk" specialties, such as "online pharmacies, telemarketing, and online gaming," who are "having trouble obtaining or stabilizing a US-based merchant account." **Exhibit 14.**

40.     The Wessell Group's solution is to set up a bank account for the client in the name of an international business company ("IBC") outside the United States. The Wessell Group advertises that this structure will "help provide financial privacy and asset protection." *Id.*

### v. *Using offshore entities to reduce domestic entities' liabilities*

41.     I also learned that some of the offshore entities formed for clients had names that were the same as or similar to names of the clients' domestic entities. In several instances, clients paid fees charged by the Wessell Group for their offshore entities using checks written on their domestic entities' accounts. This suggests that U.S. clients may have reduced their domestic entities' U.S. income tax liabilities by claiming deductions for fees incurred by their offshore entities, as the name similarities could make the payments appear to be expenses of the

domestic entities. Additionally, the use of the same or a similar entity name could make it easier for gross receipts of a U.S. person's domestic entity to be diverted to an offshore corporation with the same or similar name, as such a diversion would likely go unnoticed by a customer.

C. *The Wessell Group's Scope*

42.    As outlined in the examples above, the Wessell Group offers customers a number of different services with features that bear the hallmarks of offshore tax evasion.

43.    One of the Wessell Group's websites, Offshorecompany.com, touts that it "forms thousands of packages every year." **Exhibit 9.** Offshorecompany.com offers three offshore strategies to clients:

a. "Offshore Company Formation Strategy 1," which costs $1,845, places funds in offshore bank accounts that are owned by private offshore companies. The Wessell Group contends that this makes the assets "extremely difficult to discover" because "transfers in and out of your account will be in the name of the company, thus omitting your personal name from the electronic trail." *Id.*

b. "Offshore Incorporation Strategy 2," which costs $3,615, offers the same structure as "Strategy 1," but also includes a "Nevis Office Program" and a nominee service. The office program is described as follows: "When an actual or potential litigant calls to see if the company is a legitimate Nevis operation, we answer the phone on your company's behalf. We also receive mail from these offshore companies and forward it to the client. These elements take away the court argument that the company is simply a shell to hide assets. The name[s] of the owners are not in the public records, so asset protection is achieved through statute by the Nevis LLC law and through a very sophisticated level of privacy." *Id.*

- 14 -

c.  "Offshore Company and Trust Strategy 3," which costs $15,040, involves a Cook Islands trust owning a Nevis LLC, with the client serving as the LLC's manager with signature authority on the financial accounts. *Id.*

44.     In my experience, the types of packages described above are designed to disguise ultimate beneficial ownership of assets.

45.     As outlined below, the Wessell Group has engaged in a substantial amount of business with customers seeking these and similar packages.

46.     For instance, I learned that in calendar year 2011, one Wessell Group entity, 1-800-Company LLLP, recorded revenue of approximately $3.5 million in its profit and loss statement. As detailed below, approximately $2.2 million of that amount related to international work:

| Type of Revenue Reflected in 1-800-Company's Profit & Loss Statement | Percentage of 1-800-Company's Total Revenue | Amount |
|---|---|---|
| Aged company (a.k.a. shelf corporations) | 8.57% | $299,279 |
| Certificate of good standing and Certificate of incumbency | 1.69% | $59,108 |
| International bank | 3.46% | $120,936 |
| International corporation | 5.38% | $187,800 |
| International LLC | 9.21% | $321,617 |
| International operating program | 3.23% | $112,870 |
| International resident agent | 11.82% | $413,075 |
| International trust | 14.22% | $496,904 |
| Nominee | 5.18% | $180,923 |
| **Total Revenue for International Entities** | **62.76%** | **$ 2,192,512** |

### D.  *Alexander v. Incway Corporation*

47.     Through research of publicly available records, I discovered a court case that exemplifies the Wessell Group's activities. Specifically, I learned that the U.S. District Court for

- 15 -

the Central District of California determined that Wessell and two associates had "engaged in a 'pattern of racketeering activity' by committing numerous acts of mail fraud and wire fraud within a 10 year period to further their fraudulent investment scheme." *Alexander v. Incway Corp.*, 2013 WL 5603932, ¶ 172 (C.D. Cal. 2013), *rev'd in part on other grounds*, 633 F. App'x 472 (9th Cir. 2016). A copy of the district court's *Alexander* opinion is attached hereto as **Exhibit 15**.

48.     In about June 2008, the plaintiff in the case, Alexander, became a client of the Wessell Group. **Exhibit 15 ¶ 2.** Alexander expressed interest in establishing an account at a Swiss bank. *Id.* ¶ 8. Wessell recommended that Alexander set up an account in Nevis and deposit his funds in another offshore location—specifically Sweden. *Id.* ¶¶ 6, 8. The Court determined that it "appears" that Alexander ultimately established an offshore entity called "Cold Play Ventures, LLC." *Id.* ¶ 12. From information available to the Service, I learned that "Cold Play Ventures" was organized in Nevis. Alexander wired approximately \$525,000 to The Alps. *Id.* ¶¶ 25–26.

49.     Describing Wessell and a few of the Wessell Group entities, the Court noted that: "Given the interconnectedness of Wessell and the corporate defendants, and the fraudulent purposes for which these entities were designed, the exact relationship between the entities involved is unclear." *Id.* ¶ 94.

## VI.     **Noncompliance by Wessell Group Clients**

### A. *The Service's Offshore Voluntary Disclosure Programs*

50.     The Voluntary Disclosure Practice is a longstanding practice of the Service's Criminal Investigation Division ("CI") and takes timely, accurate, and complete voluntary disclosures into account when CI is deciding whether to recommend criminal

prosecution of a person to the U.S. Department of Justice. The program enables noncompliant persons to resolve their tax liabilities and minimize their chances of criminal prosecution. The Voluntary Disclosure Practice requires participating persons to cooperate with the Service in determining their correct liability for taxes and penalties, but it does not specify any particular terms for resolution of taxes and penalties.

51. On March 23, 2009, the Service announced a voluntary disclosure program designed to bring into compliance with U.S. tax laws persons that used undisclosed foreign accounts and undisclosed foreign entities to avoid or evade taxes. This program, known as the 2009 Offshore Voluntary Disclosure Program ("2009 OVDP"), ran from March 23, 2009 through October 15, 2009 and covered tax years 2003 through 2008. By entering and qualifying for the 2009 OVDP, persons were required to file all original and amended returns and pay all taxes, interest, and predetermined penalties, including a 20 percent offshore penalty.

52. After the 2009 OVDP closed, the Service opened a second special offshore disclosure initiative known as the 2011 Offshore Voluntary Disclosure Initiative ("2011 OVDI"). The 2011 OVDI ran from February 8, 2011 through September 9, 2011 and covered tax years 2003 through 2010. The objective of the 2011 OVDI was the same as the 2009 OVDP. However, the penalty framework changed, and the offshore penalty rate increased from 20 percent to 25 percent.

53. The Service began an open-ended offshore voluntary disclosure program in January 2012 ("2012 OVDP") on the heels of strong interest in the 2011 OVDI and 2009 OVDP. The 2012 OVDP has a higher penalty rate than the 2011 OVDI and is currently available to persons.

- 17 -

54. I reviewed the Service's databases that captured information from the 2009

OVDP, the 2011 OVDI, and the 2012 OVDP (collectively, the "voluntary disclosure programs").

Persons who participated in these programs identified undeclared accounts held in jurisdictions

in which the Wessell Group offers to set up bank accounts and entities for its clients.

55. The banks and locations from the voluntary disclosure programs where the

Wessell Group offers to establish financial accounts for clients are listed in the table below.

| |
| --- |
| HSBC - Hong Kong |
| Caye Bank – Belize |
| Atlantic International Bank – Belize |
| MMG Bank – Panama |
| HSBC - Cayman Islands |
| First Caribbean International Bank – BVI |
| Cayman Bank - Cayman Islands |
| Barclays Bank - Seychelles |
| Swiss Bank – Switzerland |
| Royal Bank of Canada - Cayman Islands |
| Bateman Financial - Cayman Islands |
| Thales Securities - Cayman Islands |

*See* **Exhibit 16**.

56. A search of the Service's voluntary disclosure programs databases for Wessell

Group entities yielded voluntary disclosures for two persons who acknowledged using the

Wessell Group's services to set up offshore structures.

57. Taxpayers 1 and 2 are United States persons married to each other who had

offshore bank accounts and structures dating back to at least 2003 that they failed to report on

their jointly filed income tax returns with the Service.

58. Taxpayers 1 and 2 disclosed they each paid a total of $3,874 to the Wessell

Group in 2011 to set up their offshore structures, broken down as follows:

| Service | Amount |
| --- | --- |
| Belize Corporation | $ 1,495 |

- 18 -

| Caribbean Account | $ 550 |
|---|---|
| Swiss Account | $ 550 |
| Certificate of Incumbency | $ 455 |
| Notary | $ 200 |
| Shipping | $ 29 |
| Mail Forwarding | $ 595 |
| Total | $ 3,874 |

59.    Shortly after engaging the Wessell Group, Taxpayers 1 and 2 discontinued use of their overseas holdings and reported their violations to the IRS, which led to the imposition of over $200,000 in penalties. The penalties were only for tax years 2003–2010 and were not tied to the entity or accounts set up by the Wessell Group in 2011 because Taxpayers 1 and 2 abandoned the scheme that year. Nonetheless, their use of the Wessell Group was consistent with a scheme that led to the penalties and could have led to further violations of the tax laws had they not decided to make a voluntary disclosure.

### B. Other Examples

60.    The Service is aware of a third taxpayer, Taxpayer 3, who used the Wessell Group to set up entities in Nevada and in Turks and Caicos in 2007. The Nevada entity was set up before the Turks and Caicos entity, and the entities had similar names. The Wessell Group also set up and funded a bank account for the Turks and Caicos entity in that jurisdiction for Taxpayer 3. The Wessell Group sent Taxpayer 3 a blank corporate booklet via U.S. mail to his post office box and provided him guidance over the phone on how to complete the various forms in the booklet for both entities. The Wessell Group registered the offshore entity with Turks and Caicos and sent Taxpayer 3 the Turks and Caicos registration certificates. The Wessell Group also supplied the directors for the Turks and Caicos entity, and Taxpayer 3 told the IRS he did not know the entity's physical address. Taxpayer 3 did not report the entity on his 2007 tax

- 19 -

return. He sold the entity in 2008 and also failed to report that transaction.

61.     From information available to the Service, I learned that a U.S. person used offshore structures set up by the Wessell Group in an attempt to willfully evade and defeat his income tax liability. *See United States v. Stodghill*, No. 3:13-cr-00036-RLY-WGH (S.D. Ind.). A copy of the indictment is attached as **Exhibit 17**. Gregory P. Stodghill pleaded guilty on December 17, 2013 to tax evasion and was sentenced to five years in prison. A copy of the plea agreement is attached as **Exhibit 18**. Through the Wessell Group, Stodghill set up entities in the British Virgin Islands and Panama, as well as at least one in the United States. He proceeded to use these entities as nominees to try to hide his connection to assets. For instance, he used a Panamanian entity to mask his interest in a residence he purchased. All told, he attempted to conceal more than $1 million in taxable income.

62.     On July 27, 2009, the U.S. Securities and Exchange Commission filed a complaint against numerous entities and individuals for violations of various securities laws in a Ponzi-type scheme, including making false and misleading statements, selling unregistered securities, and committing fraud in connection with selling securities. *SEC v. Diversity Capital Inv.*, No. 2:09-cv-5449-ODW (S.D. Cal.).[6] One of the defendants named in the Diversity Capital Complaint, Edward Lantz Ferguson, was indicted (**Exhibit 21**) and subsequently convicted of mail fraud, *United States v. Ferguson*, No. 8:09-cr-00180-AHM (C.D. Cal.), and the conviction

_____

[6] A copy of the complaint is attached as **Exhibit 19** and alleges the defendants used a series of financial schemes to funnel outside investors' funds through a number of offshore shell companies in the British Virgin Islands, the Cayman Islands, and Nevis. The complaint further alleges that funds that were funneled into the offshore shell companies were used to pay the personal expenses of the defendants. The district court entered an injunction and ordered more than $25 million in disgorgement. **Exhibit 20**.

- 20 -

was affirmed by the Ninth Circuit in an unpublished opinion, 584 Fed. Appx. 749 (9th Cir. 2014). The court found that Ferguson knowingly participated in or devised a scheme or plan to defraud and that he acted with the intent to defraud. From information available to the Service, I learned that the entity used to perpetuate the fraud was set up by the Wessell Group. The scheme to defraud investors began in at least November 2007 and continued to about July 27, 2009.

### C.  Information from Other John Doe Summonses

#### i.  CIBC First Caribbean International Bank Limited

63.  I learned that Wessell and his entities wired funds offshore for clients. On May 2, 2013, a federal district court in California[7] authorized the Service to serve a John Doe summons on Wells Fargo Bank for records pertaining to correspondent bank accounts utilized by CIBC First Caribbean International Bank Limited ("FCIB") ("FCIB John Doe Summons"). The FCIB John Doe Summons sought records of each correspondent account for FCIB, which conducts business in numerous locations, including Nevis, St. Kitts, Panama, and the British Virgin Islands. In response to the FCIB John Doe Summons, Wells Fargo Bank provided electronic funds transfer information for its correspondent relationship with FCIB. The retrieved data identified wire transfers between the Wessell Group and financial institutions located in the Bahamas. These wires identify Wessell Group entities as senders or receivers of wire transfers in which the other parties to the transactions were offshore service providers, and they reference offshore entities whose formation was facilitated by the Wessell Group. This evidence indicates that the Wessell Group is assisting U.S. taxpayers evade U.S. taxes.

_____

[7] In re Tax Liabilities of John Does, No. 3:13-cv-01938 (N.D. Cal.).

*ii. Belize Corporate Services*

64.     I learned that the Wessell Group generated income and incurred expenses in

connection with Belize Corporate Services, which is an offshore service provider.  On September

16, 2015, a federal district court in Florida[8] approved the Service's petition to serve John Doe

summonses on Bank of America, National Association ("BOA") and Citibank, National

Association for records of Belize Bank International Limited, Belize Bank Limited, and Belize

Corporate Services ("Belize John Doe Summons").

65.     Belize Corporate Services' "About Us" webpage states that the company was

"[i]nitially established as an offshore service provider primarily for Belize IBC[s]" and "is now

Belize's leading international financial service provider with a global network of professional

intermediary and private customers."  **Exhibit 22.**  Belize Corporate Services provides the

following services:

|   |   |
|---|---|
| a. | formation of Belize and other foreign jurisdiction companies; |
| b. | assistance with opening offshore bank accounts denominated in several different currencies; |
| c. | assistance with opening online and offline securities brokerage accounts; |
| d. | credit, debit, and prepaid cards; and |
| e. | virtual office and bookkeeping services. |

*Id.*

66.     The virtual office services include a local telephone number, fax number, and

address for use by the client.  **Exhibit 23.**  Mail and telephone calls can also be forwarded to the

---

[8] *In re Tax Liabilities of John Does*, No. 1:15-MC-23475 (S.D. Fla.).

client, and calls can be answered in the IBC's name. *Id.* As explained on Belize Corporate Services' "Virtual Office Services" webpage, "Having a virtual office allows you to indicate a significant physical presence in Belize to demonstrate that the Belize IBC is not only incorporated in Belize, but also carrying on business from within Belize." *Id.*

67.    It is the Service's experience that individuals seeking to avoid their United States tax obligations use such services to conceal their beneficial ownership of the offshore entity.

68.    I searched the data produced in connection with the Belize John Doe Summons and found at least 69 wire transactions to or originating from the Wessell Group.

### VII.    The Current Investigation

69.    The Service is now investigating United States persons who, at any time during the years ended December 31, 2012, through December 31, 2017 used the services of the Wessell Group to establish, maintain, operate, or control: any foreign financial account or other asset; any foreign corporation, company, trust, foundation, or other legal entity; or any foreign or domestic financial account or other asset in the name of a foreign entity. To facilitate this investigation, the Service is seeking the Court's permission to serve, pursuant to sections 7602 and 7609(f) of the Internal Revenue Code (26 U.S.C. §§ 7602, 7609(f)), a "John Doe" summons to five individuals and entities: Kevin Wessell, Lesli Wessell, Sophia Wessell, BOA, and Wells Fargo.

70.    Based on information received by the Service, the persons in the "John Doe" class may have failed to report the existence of foreign financial accounts or domestic or foreign entities under their control, failed to report income, evaded income taxes, or otherwise violated the internal revenue laws of the United States.

- 23 -

*A. Summons to Kevin W. Wessell*

71.     The summons to be served on Kevin Wessell is attached as **Exhibit A**.

72.     From information available to the Service, I am aware that the Wessell Group maintained books and records containing clients' names, addresses, phone numbers, and billing and shipping addresses; the names of clients' entities and the entities' formation documents; the offshore bank account records associated with the offshore entities, including copies of clients' U.S. passports; the ancillary services provided by the offshore services providers, such as registered agent and nominee services, support services, and office programs; and the amount of fees paid for offshore services provided.

73.     The documents described above, all of which should be accessible by Kevin Wessell, are the types of records that would help identify U.S. clients with undisclosed offshore entities.

74.     Kevin Wessell's last known address is 10370 Cameilla Street, Parkland, Florida 33076.

*B. Summons to Lesli A. Wessell*

75.     The summons to be served on Lesli Wessell is attached as **Exhibit B**.

76.     Lesli Wessell has maintained an ownership stake in the Wessell Group and can be expected to have access to the Wessell Group's books and records.

77.     Lesli Wessell's last known address is 10370 Cameilla Street, Parkland, Florida 33076.

*C. Summons to Sophia R. Wessell*

78.     The summons to be served on Sophia Wessell is attached as **Exhibit C**.

- 24 -

79.    Sophia Wessell has maintained an ownership stake in the Wessell Group.

Although she was a minor at the time she obtained the stake, she is now an adult. As a result of

her ownership stake, she can be expected to have access to the Wessell Group's books and

records.

80.    Sophia Wessell's last known address is 10370 Cameilla Street, Parkland, Florida

33076.

### D. Summons to Bank of America, National Association

81.    A copy of the summons to BOA is attached as **Exhibit D.**

82.    During the course of my investigation, I learned that the Wessell Group used

BOA to conduct financial transactions for its clients related to its business. Additionally, during

the course of my investigation, I learned that 1-800-Company LLLP used BOA to accept

electronic funds transfers from clients.

83.    Based on my experience, I know relationships such as this allow the Wessell

Group to transfer funds from BOA to other accounts in the United States or to accounts overseas.

Based on my experience, I know a domestic bank account can also serve as a means of moving

funds into a foreign bank.

84.    BOA is a subsidiary of Bank of America Corporation, which maintains its

headquarters in Charlotte, North Carolina. BOA has a location at 701 Brickell Avenue, Miami,

Florida, 22131. The records sought would be relevant in identifying U.S. persons who used the

Wessell Group's services in setting up offshore structures and bank accounts.

- 25 -

*E. Summons to Wells Fargo, National Association*

85.    A copy of the summons to Wells Fargo is attached as **Exhibit E**.

86.    During the course of my investigation, I learned that the Wessell Group had a bank account at Wells Fargo to conduct financial transactions related to its business. Wells Fargo maintains its headquarters in San Francisco, CA. Wells Fargo operates banking centers in Florida, including a location at 1541 Sunset Drive, Coral Gables, Florida 33143. The records sought would be relevant in identifying U.S. persons who used the Wessell Group's services in establishing offshore structures and opening bank accounts.

## VIII.    **The Summonses Describe an Ascertainable Class of Persons.**

87.    The "John Doe" summonses to Kevin Wessell, Lesli Wessell, Sophia Wessell, BOA, and Wells Fargo seek information regarding United States persons who, at any time during the years ended December 31, 2012, through December 31, 2017, used the services of the Wessell Group to establish, maintain, operate, or control: any foreign financial account or other asset; any foreign corporation, company, trust, foundation or other legal entity; or any foreign or domestic financial account or other asset in the name of a foreign entity.

88.    This class of persons is ascertainable in that the individuals in the class are particularized from the general public by their characteristics of being United States persons who used the services of the Wessell Group to establish, maintain, operate, or control foreign accounts, assets, or entities.

**IX.  The Internal Revenue Service Has Reason to Believe Members of the "John Doe" Class May Have Failed to Comply with One or More Requirements of the Internal Revenue Laws.**

89.    The services the Wessell Group provides to its U.S. clients, as described at length on its websites and herein, are the kinds of activities that, in the experience of the Service, are the hallmarks of offshore tax evasion, including use of offshore trusts, foundations, and corporations managed by nominee officers and secretly owned through bearer shares and/or the concealment of beneficial ownership in foreign accounts and assets in tax haven countries.

90.    As described herein, there are a number of examples of individuals using the Wessell Group's services for unlawful purposes.

91.    The information obtained by the Service and discussed in this Declaration suggests that many of the still-unknown United States persons doing business with the Wessell Group have not reported their offshore accounts, entities, or structures.

92.    Based on my experience with offshore issues, persons who hold undisclosed foreign accounts, entities, or structures often do so in order to conceal the existence of such accounts, entities, or structures and their associated income from the Service.

93.    It is the experience of the Service that there is a direct correlation between unreported income and the lack of visibility of that income to the Service. That is, when the third-party payer of income to a person is not required to, or does not, report that income to the Service, the person-recipient of that income is far less likely to report it on his or her tax returns. Many of the still-unknown United States persons doing business with the Wessell Group have likely relied on the lack of third-party reporting to support their decision not to disclose their foreign accounts, entities, or structures, with the expectation that the Service would not discover the vehicles and any associated income.

- 27 -

94. Based on the above information, United States persons in the "John Doe" class may be failing to comply with internal revenue laws governing U.S. persons' obligations to report and pay tax on worldwide income, to disclose all interests in foreign financial accounts, to file annual reports of foreign financial accounts with assets exceeding $10,000, and to file annual reports reporting offshore entities.

## X.     The Requested Information Is Not Readily Available from Other Sources.

95. To my knowledge, and based on my experience, the only repositories of the information sought that are readily available to the Service are Kevin Wessell, Lesli Wessell, Sophia Wessell, BOA, Wells Fargo, and another entity and individual identified in John Doe applications that are being concurrently filed in other jurisdictions.

96. In light of the above, the records sought by the John Doe summonses are not otherwise reasonably and timely available to the Service. To the extent that any of the proposed summons recipients have produced any documents responsive to the summonses in connection with past examinations conducted by—or past summonses issued by—the Service, the Service is not seeking reproduction of those materials here.

## XI.     CONCLUSION

97. Based upon the foregoing, I believe the information sought in the "John Doe" summonses to be issued to Kevin Wessell, Lesli Wessell, Sophia Wessell, BOA, and Wells Fargo will allow the Service to identify U.S. persons who may have failed to comply with their obligation to report and pay U.S. taxes on income earned with respect to financial accounts and entities established, maintained, operated, or controlled by or through the Wessell Group during the years ended December 31, 2012, through December 31, 2017.

- 28 -

I declare under penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.

Executed this <u>5</u> day of <u>July</u> 2018.

KAREN CINCOTTA
Internal Revenue Agent
Internal Revenue Service

- 29 -